VIRGINIA WILLIAMS VS. JNO. A. J. CRESWELL et al., Com'rs.

1. FOREIGN CONTRACTS: *Enforcement thereof. Comity of nations.*
   In the absence of any positive rule affirming or denying, or restraining the operation of foreign laws, courts presume the tacit adoption of them by their own government, unless repugnant to its policy or interests. Each state within the limit of the rule will recognize those corporations enacted into being by the legislatures of other jurisdictions, and allow access to its tribunals for a remedy on all legal contracts.

2. SAME: *Foreign corporations.*
   Foreign corporations may, by the comity of nations, make contracts in other states, and establish agencies there, unless excluded from so doing, or unless against the policy or interest of the state.

3. CHANCERY PRACTICE: *Foreclosure of mortgages. Case in judgment.*
    Where a bill is filed to foreclose a mortgage given to secure several notes, some of which are not due when the bill is filed, complainant should ask in his bill that so much of his debt as was not then due, but which might become due before final decree, be included in it. It was error to adjudge to complainants a note which matured after the filing of the bill, without some foundation being laid in the pleadings therefor.

APPEAL from the Chancery Court of *Warren* County.

Hon. E. HILL, Chancellor.

The complainants, appointed under a recent act of congress, as commissioners to take charge of the assets of the Freedman's Savings Institution, collect its debts, etc., filed this bill in chancery, to foreclose the mortgage to pay the notes· of the defendant. These notes and mortgages are the property of the Freedman's Savings Institution, and came to the possession of complainants as commissioners for collection. This institution was created a body corporate by an act of congress, in the city of Washington, District of Columbia. The fifth section of its charter defines its general business to be, to receive on deposit such sums of money as may be from time to time offered by or on behalf of persons heretofore held in slavery, or their descendants, and to invest the same in stocks and bonds, and other securities of the United States. Subsequently, by further acts of congress, the corporate privileges were extended so as to allow the loan of money, the taking of mortgages, and the establishment of branches or agencies in the southern states. A branch or agency was established in Vicksburg, where the notes and mortgages in question bear date and purport to have been executed. Their validity is denied on the ground that congress had not the power to create such a corporation, with branches in the several states. The decree embraced a note for $1,000 not due until· several months after the bill was filed, and was not provided for in the bill. This was also assigned as error.

*Harris & Harris*, for appellant, insisted:

1. That congress could not, constitutionally, create any such cor-

poration. Such power is not to be found amongst any of the powers conferred by the constitution upon congress, and hence this defense specifically made by the "answer" ought not to have been disregarded in the court below. The case of M'Culloch v. State of Maryland, 4 Wheat., 424, is often relied upon to sustain the view that congress possesses the power claimed in this instance, but the supreme court of the United States, in the case of Osborn v. The United States Bank, 9 Wheat., 859, 860, was led, after mature deliberation and thought, to review and greatly modify its opinion in M'Culloch v. State of Maryland, and there holds the doctrine that congress could not create a corporation for its own sake, or for private purposes. It will be seen however, by reference to M'Culloch v. Maryland, that the exercise of such power by congress was sustained only by the idea that the "bank" was an instrument necessary and proper for the carrying into effect the powers vested in the government. Kent's Com., 11th ed., vol. 1, p. 266. And such also will be found to be the views by which the present national bank system is sustained, and to what extent "implied" powers may be exercised. 8 Wall., 605; Same, 533. But "The Freedman's Savings and Trust Company" cannot be forced, by any construction which may be placed upon its act of incorporation, within the rule on this subject as laid down in Osborn v. The United States Bank, nor can it, in fact, be sustained by M'Culloch v. Maryland, or under any of the cases cited.

2. That if congress could create such a corporation within the district—and it is beyond the power of congress to authorize the existence of this corporation outside the district, because such existence is unconstitutional—to ask the courts of this state to enforce contracts made outside of its constitutional limits, for the mere sake of comity, would be to ask our courts to enforce that which is unconstitutional and void. And thus if our courts were to enforce them, in effect, congress would exercise a power which is denied to it by the constitution. Bank of Augusta v. Earle, 13 Pet., 589.

3. That if our views be erroneous upon the first two points argued, it was manifest error in the court below to decree for anything more than the amount of the two notes exhibited with the bill.

*Catchings & Ingersoll*, for appellees, contended :

1. That under the power to accept a cession of territory for the seat of government, and to exercise exclusive legislation therein ; no one can doubt that congress may erect corporations therein, not only public but private corporations. They have constantly exercised the power; and it has never yet been breathed that it was unconstitutional. Story's Com. on Const., vol. 3, sec. 1261. The power of congress to exercise exclusive jurisdiction over these ceded places is conferred on that body, as the legislature of the Union, and cannot be exercised in any other character. A law passed in pursuance of it is the supreme law of the land, and binding on all the states, and cannot be defeated by them. The power to pass such a law carries with it all the incidental powers to give it complete and effectual execution ; and such a law may be extended in its operation incidentally throughout the United States, if congress thinks it necessary so to do. But if intended to have efficiency beyond the district, language must be used in the act expressive of such an intention ; otherwise it will be deemed purely local. Story's Com., vol. 3, sec. 1221.

2. That congress intended to create a corporation, which should exercise its powers, as well outside of as within the District of Columbia, we know, both from the language of the act of June 20, 1874, which, expressly and in terms, alludes to and recognizes the establishment in the states of branch banks or agencies, and from the general purpose and design of the corporation. M'Culloch *v.* Maryland, 4 Wheat., 316.

3. That by the comity of nations, the laws of one will be recognized and enforced in another. Courts will always expound and execute them according to the laws of the place in which they were made, provided they do not conflict with the laws or policy of their own country. Bank of Augusta *v.* Earle, 13 Pet., 589.

4. That the right to sue is expressly declared by sec. 2416, Rev. Code, 1871.   It is true, in terms, the right to sue, of a corporation existing by the laws of the District of Columbia, is not mentioned in that section ; but it was manifestly an inadvertance, inasmuch as no reason exists for drawing a distinction in this respect, between such a corporation and one created by a state ; and the statute, after all, but declares the principle which had been long recognized and enforced by the courts of the country.   With reference to the alleged error in the amount for which the decree below was rendered, we simply remark that, not having complied with rule 25 of this court, appellant is in no position to urge such an objection.   At all events, appellees are ready to enter a remittitur for any excess which may in fact exist in the decree.

SIMRALL, C. J., delivered the opinion of the court.

The complainants, appointed under a recent act of congress, commissioners to take charge of the assets of the Freedman's Savings Institution, collect its debt and wind up its business, brought this suit in chancery to foreclose the mortgages, and to pay the notes of the defendants.

These notes and mortgages are the property of the Freedman's Saving Institution, and came to the possession of the complainants, commissioners, for collection.   This institution was created a body corporate, by act of congress, in the city of Washington, in the District of Columbia.   The 5th section of its charter defines its general business to be, to receive on deposit such sums of money as may be from time offered by or on behalf of persons, heretofore held in slavery, or their descendants, and investing the same in stocks, bonds, treasury notes and other securities of the United States.   U. S. Stat. at Large, vol. 13, p. 511.

Subsequently, by further acts of congress, the corporate privileges were extended so as to allow the loan of money, the taking of mortgages, and the establishment of branches, or agencies in the southern states.

A branch or agency was established at Vicksburg, in this state,

where the notes and mortgages in question bear date, and purport to have been executed.

Their validity is denied on the ground, as presented by counsel, that congress has not the power to create such a corporation, with branches in the several states. It is conceded that congress might enact the original charter, but it could not authorize, as was afterwards done, the corporation to enter the states with branches or agencies, and transact business there, of the character disclosed in the bill.

The argument is that congress does not possess the power to pass acts creating corporations generally, for any and all the purposes for which the states may grant charters, and reference is made to the cases of M'Culloch v. Maryland, 4 Wheat., 424, and Osborn v. Bank of United States, 9 id., 859, 860. The answer to that is, that this savings institution was made a body corporate, with its location and domicile at Washington city, in the District of Columbia, and by virtue of the grant of "exclusive legislation in all cases whatsoever over the district" to congress, it could, at discretion, grant a charter to a savings institution.

Whether the state of Mississippi might not have prohibited the location of an agency in this state is a question not necessarily arising on this record, and we decline to consider it. Counsel for the appellants urge the argument with force, that congress could not, by it own authority, establish branches in the states against their objection and prohibition. If that were conceded, it would not follow that these notes and mortgages were void. If the Freedman's Savings Institution had no authority by its charter to loan money and take security therefor, or to discount paper, then the obligations here sought to be enforced are of no validity. A corporation in this country, being the creature of positive law, has such power as is conferred upon it, and cannot make a particular contract unless the power is given expressly or by necessary implication. Commercial Bank of Manchester v. Nolan, 7 How., 508 ; Bacon v. Mississippi Insurance Co., 31 Miss., 116. It follows that unless the Freedman's Savings Institution and Trust Co.

was enabled to invest its funds in, or to discount notes and mortgages, then these contracts are *ultra vires* and void.  It is not controverted that it had such power generally, but it is said it could not exercise it in this state.  Is it true that a bank or a savings institution with the privileges of this one, may not, through an agency, make a loan of money outside of the District of Columbia and secure it?

It is well known that banks and insurance companies, and other associations acting under charters, have, through their agents, entered other states than those of their domicile, and made investments in bonds, notes and mortgages, have issued policies of insurance, bought and sold exchange.  A banking corporation, with power to loan, discount, and buy and sell exchange, would be seriously crippled in its operations if it could not constitute an agent at the great centers of commerce to present a bill of exchange for acceptance, make collections and investments in other bills of exchange for remittances, or to create a fund in some other state or country, to draw against according to the needs of its business.  We know this to be every day's practice, and yet such transactions involve the foreign corporation in a multitude of new contracts beyond the jurisdiction of its domicile.  Much the largest part of the insurance is done in this state by foreign corporations, not because of any enabling statute, for the statute regulating that subject is comparatively of modern date.

The right reposes on the law of comity, that beneficent rule of the private law of nations to which all civilized communities assent, viz:  " That in the silence of any positive rule affirming, or denying, or restraining the operations of foreign laws, courts presume the tacit adoption of them by their own government, unless repugnant to its policy or interest."  Therefore, each state within the limit of the rule will recognize those corporations, enacted into being by the legislatures of other jurisdictions, and allow access to its tribunals for a remedy on all legal contracts.

In Bank of Augusta *v.* Earle, 13 Pet., 589, the court say, in terms, that by the comity of nations, foreign corporations may

make contracts in other states, unless excluded from so doing, as against the policy or interest of the state. The union of these states in a common government, as members of the same political family, suggests, and indeed requires a larger degree of comity and friendship than prevail among foreign amicable states. Business ramifications are intimate; the commercial system is free and almost unrestricted. It is the common practice of the corporations of one state to make loans to the individuals or corporations of another; and there is no reason, that can be advanced, if the exigencies of business require it, why a foreign corporation may not have an agent or agency in another state. Long continued practice, without objection, evinces, most unmistakably, its utility and rightfulness. If it be claimed that a foreign corporation cannot make a contract in this state, which is lawful in itself, and within the scope of its corporate powers, we must be referred to some positive rule declaring a prohibition, or regulating the right. Something of that sort is found in the laws of this and other states, defining the terms on which foreign insurance companies may do business in this state. Until the enactment of these laws, it was the practice for such of said corporations as chose to do so, to appoint their agents here, and issue policies of insurance, and their right to do so has never been seriously questioned, certainly not since the decision in the case of the Bank of Augusta *v.* Earle, *supra*, in 1839.

The decree embraced a note for $1,000, not due until several months after the bill was filed. This is complained of, as not permissible under the chancery practice.

The complainant ought, in his bill, to have claimed that so much of his debt as was not then due, but which might become due before final decree, should be included in it; or, if that is not done, he ought to have filed a supplemental bill, praying that this note, matured since he exhibited his bill, might be provided for in the decree. It is irregular to adjudge to the complainant the note which matured 1st of January, 1876, without some foundation being laid in the pleadings.

For this error, the decree must be reversed, and cause remanded, with leave to complainants to foreclose their mortgages for so much of the debt as was due at the time suit was brought, or to amend so as to include the last matured note.

For this error decree reversed, and the cause remanded.