J. N. McLane et ux., Appellants, vs. Piaggio Brothers and Richard L. Campbell, Appellees.

24  71
45  661
49  380

24  71
52  546

1. A subpœna in chancery may be served on a wife by delivering a copy of the same to her husband, with whom she is co-defendant, in the manner provided by statute for service by delivery to a person above fifteen years of age residing in the family.

2. Where a mortgage secures promissory notes falling due at different dates, and a bill is filed to foreclose the mortgage after the maturity of one, but before that of the other, and the latter note matures before the decree of foreclosure and sale is rendered, the decree may cover the latter as well as the former note if a proper foundation therefor has been laid in the bill.

3. That a wife who relinquished her dower by joining with her husband in the execution of a mortgage, did so "without any pecuniary consideration thereunto moving her," is not a good plea to a bill filed to foreclose the mortgage. A pecuniary consideration to the wife is not an essential of a relinquishment of dower made, in the manner prescribed by the statute, to a mortgage valid as against her husband.

4. Where a settlement of accounts has been made by parties competent to contract, and promissory notes executed by one of them to the other for an amount covering both the balance found to be due him and an additional sum for forbearance, and a mortgage has been made to secure the notes, and no fraud or unfair dealing on the part of the mortgagee is shown, such settlement is a sufficient consideration for the notes and mortgage, and the settlement will not be disturbed.

5. The fact that the mortgagor was influenced by friendly advice to make such settlement is not, in the absence of fraud upon the part of the person giving the advice, a defence to the foreclosure of the mortgage in favor of such person.

6. When a final decree has been entered and a petition for a rehearing is filed within the time prescribed by the statute and rule of court governing in the Circuit Court, it is not improper upon a hearing upon such petition to modify the decree as to an error admitted by the complainant, and found by the Chancellor, to exist.

7. An appellate court will not allow claims of credit denied by the lower court, unless the testimony shows clearly that there was error in denying them.

8. The vendee of a purchaser at a foreclosure sale, should, where his right to possession is clear, be allowed a writ of assistance against a mortgagor in possession of the mortgaged property, and who was a party to the foreclosure suit.

9. The practice of granting a writ of assistance without notice to the party in possession, though sustained by authority, is disap-

proved. Where, however, as in the case at bar, the parties in possession do not claim that they have been deprived of property covered by the mortgage and decree without notice of such application, but say they are and have always been ready to give possession of the property so described, and claim that the description of the property for which the writ was given is not the description contained in the decree, and that they have been deprived through the instrumentality of the writ of property not included in the decree, the fact being however, that the description in the writ is, though not so detailed, clearly the same in substance as that in the decree, the action of the Chancellor in granting the writ without notice will not be reversed.

10. As against a mortgagor who has furnished a description of land as that upon which certain improvements intended to be mortgaged by him were located, his statement that the improvements are not on the land so described, is not sufficient evidence of their not being on such land to authorize a court to set aside a writ of assistance which has been executed, and restore such property to his possession.

11. A plat of a survey made by a County Surveyor or his deputy, is not of itself evidence that in making the survey he began at the pine tree mentioned in a mortgage as the initial point of the description of land mortgaged and stated in such mortgage to be "about one hundred yards" southwest of a certain mill; nor is such plat evidence that certain improvements intended to be mortgaged and described in the mortgage as being on the land actually mortgaged, are not on such land.

12. A purchaser at a foreclosure sale should, upon demanding possession of the property purchased, exhibit to the party in possession the master's deed, and the vendee of the purchaser should exhibit both such deed and that from the purchaser to him, if he intends to apply for a writ of assistance against such party.

Appeal from the Circuit Court for Leon county.

Judge Broome, of the Seventh Circuit, sat in place of the Chief-Justice, disqualified.

The appellees filed their bill in the Circuit Court of Washington county against the appellants on April 30th, 1884, to foreclose a mortgage, made by them to secure two

promissory notes made by said Jesse N. McLane, bearing date January 6th, 1883, each for the sum of $2,250, with interest at the rate of ten per cent. per annum from date, and payable to the order of Piaggio Brothers, one on the first day of September, 1883, and the other September 1st, 1884. The mortgage bears the same date as the notes. The property mortgaged is " ten acres more or less " of lot three, section 26, T. 2, S., R. 19, W., within the following boundaries : " A line beginning at a certain pine tree about one hundred (100) yards southwest of Miller and Crigler's mill, (or formerly known as such) on Tucker's Bayou, and running south 27 degrees west, seven (7) chains, eighty-eight (88) links to an oak tree, and thence north ten (10) chains and ten (10) links to an oak tree, and thence north eight (8) degrees east to a cypress tree on said bayou, and thence along the shore of said bayou to the point of beginning, said parcel of land being known as the McLane mill tract, together with all the buildings, improvements, structures of every kind, saw mill, boilers, machinery, fixtures, tools and implements on said premises, or which may be substituted therefor," as may fully appear by said mortgage which is made a part of the bill.

The bill alleges that no payment has been made on the said notes, except that of $243, 75-100 has been paid on the note maturing in September, 1883, and " that from the nature of said mortgage property it cannot be so divided as to settle the past due note without material injury, if not entire destruction to the value of the remainder of the property and thereby rendering it worthless as a security " for the second note not then due, but to become due in September, 1884.

It also alleges that Piaggio Brothers being indebted to said R. L. Campbell and Emily C. Smith, and anticipating

further indebtedness to them, did, on June 23d, 1883, assign said notes and mortgage to them to secure the said indebtedness, and that there is now due said Campbell a balance of $1,145.96, with interest at the rate of ten per cent. per annum from March 31, 1884.

The notes which are made part of the bill are endorsed in blank by Piaggio Brothers, and there is in the mortgage an assignment of it and the notes to said Campbell and Mrs. Smith as collateral for any indebtedness to them, or either of them, whether existing or to arise thereafter.

This assignment is dated June 23d, 1883. The bill prays among other things that the said respondents may be foreclosed and debarred of all right and equity of redemption in the said mortgaged premises; that the same may be sold under the decree of this court to satisfy the amount due on said mortgage notes as well as the costs of this suit, and that the proceeds of such sale, after paying the costs of this suit, shall be applied to satisfy the said mortgage notes, and the remainder, if any, paid over to the respondents, and that out of the amount of said notes there shall be paid to the said Richard L. Campbell the amount of his said debt, with interest thereon, and the residue of the amount of said notes, if any, shall be paid over to the complainants, Renaldo Piaggio and David Piaggio.

Subpoena issued August 15th, 1884, returnable to the following September Rule day. Service was made on Mrs. McLane (according to the Sheriff's return) by delivering a copy to said Jesse N. McLane, for his wife, Minerva C. McLane, at Point Washington, in their usual place of abode, the said Jesse being over the age of fifteen years and residing with said Minerva at the time of such delivery, and by, at the same time, showing him the original.

On the first day of September, Mrs. McLane appearing,

specially moved to set aside the service as to her, on the ground that delivering a copy to her husband for her was not sufficient. The motion was overruled.

The defendants, in November, 1884, filed a demurrer.

The Chancellor overruled this demurrer except as to parties, and on this ground sustained it and gave complainants leave to amend the bill by alleging that Mrs. Smith had no interest in the notes or mortgage, and required the defendants to answer on or before the first Monday in January, 1885.

The complainants amended their bill by alleging that the interest of said Emily Smith in said notes and mortgage has been fully paid and satisfied.

On December 14th Mrs. McLane filed a plea stating that she signed and sealed the mortgage, but that she did so without any pecuniary consideration thereunto moving her to sign and execute the same. The Chancellor overruled this plea and gave leave to answer.

The answer of Jesse N. McLane, filed December 29th, 1884, admits the execution of the notes and mortgage.

It states (1) that he " does not believe that the description of the land, as contained in the mortgage deed and bill, is a correct description of the land intended to be embraced in said mortgage, nor that the saw mill and fixtures, as described in said mortgage are located, or situated upon the land as described in said mortgage."

(2.) That the notes and mortgage were given without any sufficient consideration in that they grew out of a contract entered into between Piaggio Brothers and defendant on October 26th, 1880, and extended on December 15th, 1881.

This contract recites that the Piaggio Brothers have agreed to advance McLane $7,000, and have accepted certain mentioned drafts, amounting to about that sum, which

## JANUARY TERM, 1888. 77

J. N. McLane et ux. v. Piaggio Bros. et al.—Statement of Case.

they covenant to pay at maturity. McLane agrees to cut logs to be furnished by Piaggio Brothers to him and to deliver them in sawed timber, deals and lumber, to the extent of the capacity of the mill at Point Washington, in Washington county, between the 15th of December, 1880, and the 15th day of December, 1881. That the said timber, lumber and deals shall be cut exclusively from logs to be furnished by the Piaggio Brothers, and McLane shall purchase logs to the best advantage and at the lowest market price for the Piaggio Brothers, and shall charge for such purchasing only the actual expenses incurred therein. * * * * That the Piaggio Brothers shall pay to McLane for all sawn timber, deals or lumber delivered the following prices, viz: for sawn timber, $2.50 per M. sup. feet, and for deals 9 inches wide and up, and 3, 4, 5 and 6 inches thick.

That at the time the said contract was entered into the defendant was the owner of the steam saw mill, described in the mortgage, situated on Tucker's Bayou, at Point Washington, in said county, and the Piaggio Brothers were timber and lumber merchants in Pensacola, Fla., and the mill had the capacity to cut 30,000 feet of deals and lumber per day, as was well known to said Piaggio Brothers. That the contract was, with some slight variations, extended up to January 1st, 1883.

That defendant fully complied with all the terms and stipulations contained in said contract, and was ready at all times to operate his said mill daily up to its average capacity of 600,000 feet per month, or 7,200,000 per year. That under such contract he, before December 13th, 1881, cut and delivered to Piaggio Brothers 2,996,386 feet of deals and lumber, and 168,186 feet of cypress lumber, worth at least $6 per thousand for cutting. That after

78 SUPREME COURT.

J. N. McLane et ux. v. Piaggio Bros. et al.—Statement of Case.

December 31st, 1881, he cut and delivered to them 1,169,-602 feet of deals and lumber, and 338,220 feet of timber, and 20,100 feet of cypress lumber, all of which under said contract was of the value of $5,543.06.

That owing to the fact that the Piaggio Brothers failed and refused to furnish the necessary logs to defendant, during the period covered by their contract, to keep the mill at work up to its average capacity, he was injured and suffered a loss of nearly 9,423,393 feet of lumber.

That he suffered not only the loss of the amount that he was to be credited per thousand upon his debt, but the profit he was getting beside upon the lumber he would have been able to have delivered to them under said contract.

That on September 9th, 1881, he contracted with them an indebtedness of $3,000 for the purpose of purchasing new boilers for his mill. He understood this loan to be on the terms of the said contract as to the $7,000.

That with a proper credit of the timber, deals and lumber delivered, and the damages done to him by their failure to keep him supplied with logs, and their refusal for him to purchase logs, he had, on the first day of January, 1883, paid Piaggio Brothers back, or nearly so, the ten thousand dollars. That he made an effort to settle with them on this basis, but they were unwilling, and the matter was referred to R. L. Campbell to say how they should settle, and that after the reference Campbell informed defendant that he had examined the matter and stated the account, and that he, defendant, was indebted to them in the sum of $4,000, and that by adding $500 for forbearance they would give defendant nearly two years to pay the $4,000, if secured by a mortgage on his mill property, and that then defendant executed said notes and mortgage.

That in closing up the matter on this basis he was induced to do so upon the representations of Campbell, he having before that been his attorney and counsellor. That at the time the accounts and transactions were referred to Campbell, the Piaggio Brothers were due him and Mrs. Smith about $3,000.

(3.) That at the time he executed the notes and mortgage, defendant and the Piaggio Brothers entered into another contract, by the terms of which the latter agreed to furnish such logs as were then in Choctawhatchie river and in McLane's boom, amounting, by estimation, to 3,000, and defendant was to cut the same into lumber of specified dimensions, and to pay for the logs at the rate of $6 per thousand, at the mouth of said river, whither they were to be transported at the expense of the Piaggio Brothers, and they to pay defendant for the same cut into lumber, at the rate of $10 for prime and $9 for merchantable deals, payment to be made as follows, viz: the Piaggio Brothers to reserve the price of the logs at the rate aforesaid, and also $1 for each thousand feet as a credit on the said notes. Payments were to be made at the end of each month. That under this contract Piaggio Brothers furnished about two thousand logs, and defendant cut and delivered 335,-910 feet of prime lumber, at $10 per thousand, and 148,-419 feet merchantable lumber at $9, aggregating $4,695.35-100, and that this amount should have been placed to the defendant's credit on said notes—but the Piaggio Brothers failed and refused to enter such credits.

(4.) That the Piaggio Brothers are indebted to defendant in the sum of $250 for the use and rent of a flat for two months, and that this amount should be credited on said notes.

(5.) That defendant has reason to believe that Campbell

and Mrs. Smith had knowledge or notice of all the out-standing indebtedness of the Piaggio Brothers to defend-ant, set forth in this answer, before the assignment of the notes to them.

The complainants filed a replication on February 7th, 1885. On December 16th, 1885, the case was ordered to be transferred to the Circuit Court for Leon county, on account of the then Judge of the First Circuit being dis-qualified therein, he having been of counsel therein.

The other facts of the case are stated in the opinion.

*Daniel Campbell, Maxwell & Mallory* and *John W. Malone* for Appellants.

*D. L. McKinnon* and *Blount & Blount* for Appellees.

MR. JUSTICE RANEY delivered the opinion of the court:

I. The service of the subpœna on Mrs. McLane by deliv-ering the copy for her to her husband in the manner stated in the return of the sheriff, was legal service. To hold that it was not so would be to construe the statute as not authorizing service on her by delivering the copy to any one of the requisite age residing in her family, unless she was the head of the family. We do not think such a con-struction right; and there is nothing in the relation of husband and wife to exclude the former as one to whom such delivery can be made for the latter.

II. The particular defect in the bill as to which the de-murrer was sustained was cured by the amendment made under the order on the demurrer.

The only other ground of demurrer meriting considera-tion, is that as to the note falling due in September, 1384, and which had not matured at the filing of the bill.

When a mortgage secures several notes and one has become due and remains unpaid, and there has been a breach of the condition of the mortgage before the institution of the foreclosure suit, the bill may ask as to the other note or notes, that such of them as shall mature before the final decree be included in it. Where no foundation is laid in the bill for including in the decree the note or notes that may become due, it is irregular to include them in it, unless a supplemental bill is filed. Jones on Mortgages, Sec. 1478 ; Adams vs. Essex, 1 Bibb, 149 ; Manning vs. McClung, 14 Wis., 350 ; Smalley vs. Martin, Clark's Chan. R., 293 ; Williams vs. Cresswell, 51 Miss., 817 ; Malcolm vs. Allen, 49 N. Y., 488 ; Chandler vs. Pettit, 1 Paige, 168.

The statements and prayer of the bill are sufficient to sustain the decree as to the note falling due after the institution of the suit. Though there is not an express statement as to the probable maturity of the note before final decree, yet the note is declared upon as not due and properly described, and foreclosure and relief are asked as to it, and it did mature before final decree. The Chancellor did not err in his action on the demurrer.

III. The mere fact that Mrs. McLane was not moved by a pecuniary consideration to relinquish her dower in the property does not invalidate the relinquishment. A relinquishment of dower executed by a wife in accordance with the requirements of the statute is, if the deed of conveyance or mortgage be valid as to her husband, binding on her. The statute prescribes the essentials of a relinquishment and a pecuniary consideration to the wife is not one of them. The plea is no defence to the bill as against her or her husband and the plea was properly over ruled. Scribner on

Dower, Vol. 2, page 318 and note ; Bailey vs. Litten, 52 Ala., 282.

IV. There is in the answer no allegation of concealment, misrepresentation, or fraud or unfair dealing upon the part of the Piaggio Brothers in the settlement which resulted in the execution of the notes and mortgages, nor of any improper conduct on the part of Mr. Campbell. The fact that the latter was a creditor of the Piaggio Brothers or that before the reference was made to him he had been the attorney of McLane is not sufficient to annul the adjustment made of the business controversy between them. Considering the statements of the answer as to the settlement resulting in the execution of the notes and mortgage, we are unable to perceive that they present anything more than a voluntary adjustment, through the aid of a third person having the confidence of both parties, of the differences or misunderstanding and claims, and a subsequent dissatisfaction upon the part of the defendant, Dr. McLane, with the same, without the averment by him of any fact showing that he has any legal or equitable ground of complaint against any one concerned in the settlement.

Mr. Campbell states in his testimony that the Piaggio Brothers claimed that McLane was largely indebted to them for money advanced, and that the latter claimed that by deliveries of lumber and in consequence of the damage he had sustained by the non-fulfillment of their contract for the delivery of timber and lumber the debt had been fully or more than discharged ; and that they agreed to submit these differences to him for decision, and that after examining both claims to the best of his ability, and allowing McLane all the credits, that, in his judgment, the latter was entitled to, he found a balance of about $4,200 to be due Piaggio Brothers. Both parties, he says, were dissatisfied with his

finding, and observing the result, he told them that no harm had been done and that they could go to law if they chose without being prejudiced by the reference. That a few days after this the Piaggio Brothers and McLane told him they had made a final settlement on the terms of $4,-200 as due the former, and that $300 was added to the debt as a consideration for indulgence as to the time of settlement, and he was requested by both parties to draw up the notes and mortgage, which he did, and that these instruments were the result of all business transactions between said parties up to their date.

As to the indebtedness of the Piaggio Brothers to himself and Mrs. Smith, his daughter, at this time, Mr. Campbell says that they had ample security for the debt, which amounted to about $5,000. That this was known to McLane, who he says was anxious that the mortgage and note should be added to the collaterals because he thought it would be the means of securing his indulgence. All this indebtedness, he says, has been paid except about $835. He speaks of having surrendered about a year previous another mortgage, and held on to McLane's as long as he could, as to surrender it to Piaggio Brothers would have resulted in an immediate suit.

David Piaggio confirms Campbell's statement as to the reference and finding and both parties being dissatisfied with the decision, and says they left Mr. C.'s office without accepting the decision, but that afterward the Piaggio Brothers agreed to abide by it and give the credit provided for on the notes, if McLane would increase the amount so as to bring it up to $4,500, and that both parties then informed Campbell of their settlement and requested him to prepare the notes and mortgages. He says that some of McLane's claims for breaches of contract were allowed un-

der the final settlement made after the decision of Campbell. This settlement, he says, was made without consulting Mr. Campbell further, he being simply requested to draw up the notes and mortgage, and that neither party was influenced by any one to make the settlement.

The defendant, McLane, testifies that as the Piaggio Brothers refused to allow him any damage for their failure to comply with their contract it was agreed to submit the matter to Campbell, who had been his attorney and legal adviser, and was also theirs ; and that Campbell advised that witness should pay them $4,000. That to this he at first demurred, as he did not think he was due them anything. That Campbell represented that he would control the mortgage, and that it should not be foreclosed, and that it would be to the interest of the Piaggio Brothers to keep witness' mill running if he gave the mortgage, but he still refused to sign or give the mortgage, but the next morning he received a note from Mr. Campbell advising him, to avoid litigation, to execute the notes and mortgage. That then he returned to his home at Point Washington without signing the papers. The addition of $500 he says was given for an extension of time.

The testimony of Campbell and Piaggio, instead of adding any strength to appellants' case, certainly weakens it and sustains the view we have taken of its character as presented by the answer.

The representations which McLane says Campbell made are not shown to have been made on behalf of Piaggio Brothers. The answer sets up no contract between McLane and Campbell, nor any fraud or misrepresentation upon the part of the latter. McLane's testimony shows no contract upon the part of Campbell either to prevent or to save the latter harmless against an enforcement of the mort-

JANUARY TERM, 1888.    85

J. N. McLane et ux. v. Piaggio Bros. et al.—Opinion of Court.

gage.    The indefinite statements he makes cannot be taken as indicating that McLane did not intend to pay the debt or that Campbell contracted to prevent its enforcement. The clear effect of Campbell's testimony is that he did delay its enforcement for several months after the maturity of the first note.    In addition to this we must say that the only natural inference to be drawn from McLane's testimony in that Campbell's representations were made as a friendly counsellor, and not as a business transaction, and certainly not for any consideration of benefit to himself or of loss to McLane.

V.    A final decree of foreclosure and sale was rendered and signed by the Chancellor on September 17th, 1885.    The sum decreed to be due under the mortgage is $5,298.38, and of this amount it is directed that $783 be paid to Campbell.

This decree was filed in the Clerk's office of Washington county on the last day of that month, and recorded on the next day.    On the day before such filing the defendant served notice on the solicitor for complainants that the former would apply for a rehearing on the 12th of the then succeeding month, and on the same day that the decree was entered a petition for a rehearing was filed in the Clerk's office.

Upon this petition coming on to be heard the complainants filed a paper remitting $567.55.    This paper is a consent and declaration upon their part that " the amount of the decree therein be reduced from the sum of five thousand two hundred and ninety-*six* dollars and thirty-eight cents, to the sum of four thousand seven hundred and twenty-eight dollars and eighty-three cents," and they renounce and remit the *excess*, to-wit: the sum of $567.55 allowed them by the original decree.

The amendatory decree recites that the cause came on to be heard upon petition for a rehearing, and, " it appearing that in the decree, on which a rehearing is asked, is, by miscalculation, an excess against the defendants, and the plaintiffs having offered to remit said excess by which the decree would be reduced to the sum of $4,728.83, and a remittur having been made and filed, and it further appearing that there is no *further* ground for a rehearing," and then decrees that a rehearing be denied, and further decrees a modification of the original decree in accordance with such remittur.

It is apparent that the complainants were in error, to the extent of two dollars, as to the amount of the original decree.

Counsel for McLane admits, as provided by Chancery Rule 87, that a final decree in chancery may, before the entry of the same, be corrected by the Judge as to clerical mistakes or errors arising from any accidental slip or omission, without the form or expense of a rehearing, but contends that after its entry that no correction can be made, except by rehearing upon petition duly filed within the time prescribed by and in accordance with the statute and rule governing rehearings in this State. The second decree, he says, is erroneous because the Judge had no power to make it, and he argues that if the Judge had not the power to make it, then the former decree is in full force ; but appears from the record to be erroneous because it grants to the appellees $569.55 too much.

It is apparent from the recitals of the decree that there was a hearing on the petition, and that the reduction was made on the admissions of the complainants, on such hearing, and not independent of the proceedings instituted by the petition for a rehearing. Though the decree, as pre-

sented in the transcript, is somewhat inartificially drawn, yet the only conclusion to be drawn from it, when considered in all its parts, is that the Judge found, upon the hearing upon such petition, that there was such an excess, and, upon such hearing, determined to modify the original decree, then and there, and he being at the same time satisfied that there was no other error in it, refused to " further " disturb it.

We are satisfied that the modification has been made at a rehearing upon petition for a rehearing, and that it was, in effect, a rehearing to this extent, and we are also satisfied, after full investigation and careful consideration of the question, that the actual entry of a decree upon the minutes of the court does not preclude a rehearing, if the petition therefor is filed within the time prescribed by the statute and rule governing rehearings. Chancery Rules 87 and 90, McC.'s Dig., sec. 148, p. 165.

After the lapse of this period, a decree which has been actually entered, cannot be reached by a petition for a rehearing any more than one duly enrolled on parchment, could be reached by such proceeding under the old English practice, by which practice it was provided that a party might, by entering a *caveat* after the entry of the decree in the Registrar's book, delay the enrollment for twenty-eight days, to enable him to file a petition for rehearing. Cooper's Daniel Chancery, chapter 26, sections 3 and 4, and chapter 32, section 1.

There was no error in making the second decree.

VI. It is urged that the original decree is erroneous in that certain credits were not allowed on the notes sued on.

These credits are as follows: 1st, one of $3,360.46 for prime lumber, and $1,327.78 for merchantable lumber, delivered under the second contract, (which was, in fact, ex-

ecuted January 8th, 1883,) set up in the answer; 2d, one of $118, for labor performed in the delivery of lumber; 3d, $235, charged by and allowed the complainants for logs furnished under the contract just mentioned are claimed to have been in fact furnished under the contract in settlement of which the notes were given; 4th, the logs covered by the second contract are claimed to have been damaged and worth only $4 per thousand, whereas $6 is charged for them, and it is further claimed that they injured the quality of the lumber.

(1.) The credit allowed McLane by the Piaggios in their account and testimony as to the transactions or business under the second contract is $4,460.30-100. This is $227.-93-100 less than the aggregate value of the prime and merchantable lumber for which McLane claims credit.

The quantity of lumber which the Piaggios acknowledge in their account to have received is 471,595 feet. McLane states in his sworn answer that he delivered 484,329 feet, but in his testimony he puts the quantity at 483,500 feet-being an excess of 11,905 feet over the figures given by the account of the Piaggios, which figures, aggregating, as we add them, 471,595 feet, David Piaggio, in his testimony says represent the quantity received by them of McLane.

J. R. McLane in his testimony puts the quantity at the figures stated by J. N. McLane in his testimony, but he does not show any means of knowledge on the subject, nor is there anything in the testimony presented by the record to enable us to say that the Chancellor erred in taking the figures of complainants. As J. R. McLane neither shows that he measured or had any connection with the delivery of the lumber, nor states anything to show a foundation for his figures, and as the defendant's answer and testimony are not consistent, we are unable to find ground for

saying that the complainants' figures should not have been adopted.

(2.) As to the $118 claimed for labor performed in the delivery of lumber, the only testimony is that of Jesse R. McLane, who testifies that " there was due defendant, Jesse N. McLane, the sum of $243.75-100, paid by Knowles Brothers for labor performed in the delivery of logs $118.-80." There is no other testimony on this point. This testimony is a mere declaration of an indebtedness without a statement of any facts showing either that complainants contracted it, or are liable for it, or that the witness had any personal knowledge of any such facts. ·The defendant says nothing on the subject. There is an entire failure of proof.

(3.) The testimony as to the $235 item claimed as a credit is as follows:

B. F. Colvin, in testifying on May 23d, 1885, says his occupation is sawyer or filer, &c., at saw mill, and that his residence is at Point Washington, and he knows the parties to the suit and the mill, and sawed all the logs delivered by Piaggio Brothers between December 15th, 1880, and January 1st, 1883, and also knows " that specification No. 1, 183 logs, 39,186 feet, was sawed in July 1882." Jesse R. McLane says he is a mill man by occupation and his residence is at Point Washington. After testifying as to the capacity of the mill during the period covered by the first contract and the quantity of lumber &c., sawed and delivered by defendant under the first contract, and other points concerning contract, he says that he also knew that specification No. 1, 183 logs, 39,186 feet, were sawn and delivered in July 1882. As to this matter the defendant, Jesse N. McLane, says that specification No. 1, 183 logs, 39,186 feet, was sawed in July 1882.

In the account of the Piaggio Brothers there appears in

the specifications of logs delivered to McLane, Specification "No. 1,183 logs, 39,186 sp. ft., at $6 per *M.*, $235." David Piaggio says that this account shows the logs delivered by them to McLane under the second contract.

The testimony does not authorize us to allow the credit. Colvin does not show that he had any connection with the mill after the making of the new contract in January, 1883, and admitting that he knew that a similiar cut was made in July 1882, how do we know that he knows anything about what logs were delivered in 1883 under the new contract? The McLanes do not say directly that there was no such delivery of logs under |the second or January 1883, contract, nor do they show what deliveries were made under such contract, or give any facts or circumstances explaining and giving weight to their statement as evidence which should be taken in preference to Piaggios positive statement as to the delivery. To say the least, we are unable to find any reason for permitting their statements to overcome Piaggio's.

(4.) It is to be observed in connection with the fourth item claimed as a credit, viz: that the damaged condition of the logs reduced their value from $6 per *M*, the contract price, to $4, that no such defence is made in the answer, and beside this the answer states that the Piaggio Brothers agreed to furnish such logs as were then in the Choctawhatchie river and in McLane's boom, amounting, by estimation, to 3000, and defendant was to cut the same into lumber, &c., and that under this contract they furnished about 2000 logs and the defendant cut and delivered 335,910 feet of prime and 148,419 of merchantable lumber, at the price stated in such contract.

The defendant, in answer to the 12th interrogatory, calling upon him to state anything else that will benefit either party, says that the logs furnished under the second contract

were sap, damaged and worm eaten, and not worth more than $4 per M., and Jesse R. McLane, in answering the same question, says they " were inferior by reason of being sap, damaged, worm eaten, &c., and were not worth more than $4 per M., based on the amount of merchantable lumber sawed from them."

(5.) The answer claims that the complainants are indebted to the defendant, McLane, in the sum of $250 for the use and rent of a flat, and that this amount should be credited on the notes.

The defendant testifies that " under the first contract the complainants were to have the use of the flat, but they retained it two months after the expiration of the contract, and they did not return it at the first opportunity, as there were two tugs or tow-boats making regular trips or running between Pensacola and the head of the bay by which the flat could be sent home." Jesse R. McLane, a witness, testifies in about the same language. They both put the claim at $5 per day or $300.

David Piaggio says that Piaggio Brothers rented no flat from McLane, but that McLane had a flat lying at their mill, which flat, he says, they promised to send to him by the first opportunity, and that they did so. The detention, he says, was occasioned by want of opportunity to send it to McLane, and by no other cause, and it was held for McLane at his risk and until there was an opportunity to send it to him.

For reasons stated above we are unable to perceive why the statement of Piaggio should not be adopted.

(6.) Whether any of items claimed as a credit are not properly matters of offset to a suit of foreclosure and sale is a question not raised by the record nor considered by the court.

The decree of foreclosure, as modified, is affirmed.

VII. The remaining questions to be considered grow out of the proceedings subsequent to the sale under the decree.

One of the original counsel for the defendants having become Judge of the Circuit Court of the First Circuit, the case was, by an order made by him December 16th, 1885, and citing his disqualification, transferred to Leon county, in the Second Circuit, and on the 18th of January, 1886, the master having made a report of the sale, the Judge of the latter Circuit confirmed the sale, and in his order directed the master to execute a deed conveying all the interest of the defendants in the property sold to the purchaser, David Piaggio, trustee, and to put him in possession of the same.

On the 30th day of March a writ of assistance, directed to the Sheriff of Washington county, was issued in this cause by the Judge of the Second Circuit, sitting for Leon county. This writ recites the fact of the rendition of the decree of foreclosure and that a sale was made to Piaggio, trustee, and the order of confirmation, and that " it now appears that the defendants refuse to surrender possession of the mortgaged property to George W. Wright, to whom said Piaggio has sold the same, and to whom he is desirous that the same shall be surrendered," and commands the Sheriff to remove defendants from possession and put Wright in possession of all said mortgaged property, to wit: a certain parcel of land in Washington county, known as the McLane mill tract, consisting of ten acres of land, more or less, together with all of the buildings, improvements, structures of every kind, saw mill boilers, machinery, fixtures, tools and implements on said premises.

The writ appears by the return to have been executed on April 6th of same year.

No further proceedings appear to have been taken in the

JANUARY TERM, 1888.    93

J. N. McLane et ux. v. Piaggio Bros. et al.—Opinion of Court.

cause after the execution of the writ of assistance until November 16th, when defendants moved to vacate and set aside the writ of assistance and for an order that the property be returned by Wright to their possession, the grounds of this motion being—1st, that the writ was granted without notice, and 2d, to one not a party to the suit and not in a position to claim the aid of the court, and 3d, that it is not true that defendant refused to deliver possession of the lands described in the decree of foreclosure and that the writ does not conform to the decree in its description of the property mortgaged and on which foreclosure was had.

This motion is supported by an affidavit of the defendant, J. N. McLane, stating that the writ of assistance was granted without notice to defendants, and further, that it is not true that the defendants refused to give possession of the property upon which the mortgage was foreclosed ; that they are and always have been ready to give possession, according to the description of the lands in the mortgage and the decree of foreclosure, but that the description of the property for which the said writ of possession was given, is not the description in the said decree, but includes a mill and other property not included in said decree, which mill and other property, the affidavit states, the Sheriff, by virtue of said writ, wrongfully took from the possession of defendants and put into the possession of Wright, which mill and other property the affiant says he was in possession of, claiming adversely at the time of the sale by Piaggio to Wright.

The affidavit also states that affiant applied to the County Surveyor to make a survey of the property described in the decree, who, being unable to do it, appointed Wm. Miller, a competent practical surveyor, to make the survey. There accompanies the affidavit an exhibit, (" C.,") containing a plat of a survey made by Miller, which affiant

" believes gives the boundaries nearly, if not entirely, correct, the fact being that the true boundaries, as given in the mortgage and decree, do not include the mill and other property taken from defendants and put into the possession of Wright."

The certificate is as follows: " I hereby certify that I have surveyed the lands described in the annexed copy of mortgage from J. N. McLane to Piaggio Brothers. The within draft is a true copy of said survey.

"(Signed)                          " WM. MILLER,
                               " Deputy County Surveyor."

This exhibit (" C.") gives, *in writing*, as a description, that part of the description in the bill commencing with— " Namely, ten (10) acres, more or less," &c., * * * * * and ending with the words " to the point of beginning."

The description in the decree of foreclosure, a copy of which is annexed to the affidavit, is the same as that given by the bill of complaint and mortgage, as set forth. in the statement of the case.

The plat of the survey made by Miller gives the length of that part of the line running north, eight degrees east, as four (4) chains and thirty-six (36) links. The mortgage and decree do not give its length.

In opposition to the motion of defendants, Wright filed four affidavits made by himself, R. L. Campbell, Henry Baars and David Piaggio, respectively.

Wright's affidavit states that at the time of his purchase from Piaggio he did not know of any pretended claim by McLane or his wife that the mill and its appurtenances were not embraced in the description in the mortgage and decree, and that he had no notice of any such claim until he desired to take possession of said property, and that while he has known that McLane was dissatisfied he has had no intimation that he intended to take any

steps to repossess himself of the mill until this application, and that in ignorance of any such intention he has since obtaining possession expended upwards of $4,000 in improving the mill and its appurtenances, and that he has associated with himself one Henry Baars, who has also expended the sum of $4,000 since said purchase, and that they have bought, and contracted to buy, about 10,000 acres of land, at a cost of about $9,000, for supplying logs for the mill.   That he has for many years been acquainted with the said mill and the land surrounding it, and the mill has always been known as " McLane's Mill," and the tract upon which it stands as " McLane's Mill Tract," and " that he also knows the land to the southward of the mill (embraced in the diagram of Wm. Miller * * * *,) and that said land has never had upon it, within the last ten or fifteen years, any mill or appurtenances, and has never been of value exceeding $100."

Campbell's affidavit states that he drew the mortgage, and that the description therein was furnished by McLane, and was given as that embracing the saw mill of McLane, with the improvements connected therewith, and that it was the intention and understanding of McLane and Piaggio Brothers that the said mill property and everything connected therewith, was to be embraced in the mortgage, and to carry out such intention McLane furnished, and affiant inserted in the deed, the description of the property contained therein.

Baars' affidavit sustains Wright's as to expenditures.

The affidavit made by David Piaggio states as follows :

"That he was mortgagee in the mortgage lately foreclosed in the above suit, and that the loan of the money for which said mortgage was given was effected through him ; that said loan was to enable the said McLane to pay off a mortgage on the mill at PointWashington, which was over due,

and that the said J. N. McLane, in his application for said money, stated that he would give a mortgage on the property which was so mortgaged, and which he stated to be McLane's mill and appurtenances, and it was upon the knowledge of affiant of the value of the said mill and appurtenances that he (McLane) was loaned the money, which at the time of the loan amounted to, say $4,500; that affiant did not know, nor did R. Piaggio, the description of the land upon which the mill stood, but trusted to J.N. McLane for said description, and he gave to him that which is inserted in the mortgage, asserting that it was a description of the land upon which the mill stood, and said description was inserted under the belief that it embraced the mill and appurtenances, and with the intention of embracing it ; that affiant is acquainted with the locality of said mill and the land surrounding it, and that the ten (10) acres of land embraced within the courses and distances in the description in said mortgage, as surveyed by Wm. Miller, is and always has been of a value not exceeding $25, and has never had on it a mill belonging to McLane or anybody else or any of the appurtenances of a mill ; that at the time of kaming the said mortgage and for years thereafter McLane owned or possessed but one mill in Washington county, Florida, and that was known as McLane's mill and the tract upon which it stood was known as McLane's mill tract."

The Court denied the petition, and the McLanes appealed. (1) The second ground of the motion to vacate the writ of assistance will be considered first, for if it be that a vendee of a purchaser at a foreclosure sale by a master is not entitled to the writ of assistance, a consideration of any other question presented in this branch of the case will be unnecessary.

It has been said, if not held, that a purchaser himself

could not have this remedy on his own application unless he was otherwise a party to the sale, Wilson vs. Polk, et. al., 13 S. & M., 132, but this was overruled in Jones vs. Hooper, 50 Miss., 510, and it is now settled beyond question that a stranger to the decree, purchasing at the sale and obtaining the masters deed, is entitled to the relief. It is true that many of the authorities in discussing the purchaser's right to this remedy, put it upon the ground that by becoming such, he makes himself a party to the cause; still we have found no case in which it has been held that a vendee of a purchaser is not entitled to the writ

The assignee of the purchaser's bid may have it. Elkings vs. Murray, et al., 29 N. J. Eq., 388 ; Keil vs. West, 21 Fla., 508.

The foundation of the writ is the power of the Court of Chancery to enforce its decrees without the aid of a Court of Law, and its duty to do so in favor of those entitled thereto. Terrell vs. Allison, 21 Wall., 289. Where a purchaser upon obtaining title from a master, conveys the the same to a third person, and a mortgagor or other party to the suit withholds the possession against him, and there is no question as to the conveyance by the master to the purchaser, and by the latter to such third person, and the mortgagor or other party to the suit in possession shows no claim to possession under such purchaser or third person arising subsequent to the decree and sale, we are unable to see why such third person should not have the same relief against such mortgagor or other party to the suit. It will not do to say, as ground for issuing the writ, that by becoming a purchaser one submits himself to the jurisdiction of the court in the cause and is subject to its power to enforce the purchase or compel compliance with

the terms of the bid, or to any proper action by the Chancellor in the premises. The issuance of a writ of assistance assumes not only that the purchaser has complied with his bid and done all that the decree requires, but also that the title has passed to him by proper deed from the master, and that there is nothing more to be done by him in so far as vesting the *title* in him is concerned. It is the title under the decree and the withholding of possession by a party thereto, or other person bound by it, that constitute the right to relief.

In Ketchum vs. Robinson, 48 Mich., 618, it was held that the grantee of a purchaser at a foreclosure sale was entitled to the writ.

In Van Hook vs. Throgmorton, 8th Paige, 35, Chancellor Walworth said : " There is no settled practice of this Court, entitling a subsequent purchaser at a master's sale, as a matter of right, to the assistance of the Court to obtain the possession of the premises which his grantor had purchased under the decree ; and such assistance should not be given him where there is, as in this case, a very strong probability that injustice would be done to the person in possession, by such proceeding."

In New York Life Insurance & Trust Company vs. Rand, 8th How. Prac. Reports, pp. 35, 352, decided in 1853, it was held at both the special and general term of the Supreme Court that the grantee of the purchaser was entitled to the relief and it was awarded him, although his deed from the purchaser was executed seven months after the confirmation of the sale and two years after the deed to the purchaser. In the opinion delivered at the special term it is said that no real objection to the grantee of the purchaser having the remedy had upon reflection been discovered, although considerable doubt upon the subject had been enter-

tained, and, after quoting the above extract from Van Hook vs. Throgmorton, it is remarked by the judge as follows: "I think it may be fairly implied from this that in a plain case, where no injustice would be done to the person in possession, the court had the power and would exercise it in favor of a second purchaser. In the present case Frost had shown no reason why Rand should not have the possession given him. At least *he* clearly has no right to retain it as against Rand." See also Brown vs. Botts, 13 Wend., 30.

Where the right as to possession is clear we think, upon both principle and authority, that a vendee of the purchaser should be allowed the benefit of the writ.

(2.) That a writ of assistance may be granted without notice having been given to the mortgagor in possession of the intention to apply therefor is sustained by authorities of the highest respectability. Aldrich vs. Scharp, 3 Scam., 261; Hart vs. Lindsay, Walker's Chancery Report, 144; Harney vs. Morton, 39 Miss., 508; Valentine vs. Teller, Hopkins' Chan. Report, 422; N. Y. L. Ins. & Trust Co., *supra.*

The direction in the decree of foreclosure, that the master put the purchaser in possession, we regard as tantamount to the usual provision that the purchaser be let into possession, and this provision is held to render any further *order* for the writ unnecessary. Kershaw vs. Thompson, 4 J. C. R., 609; Kessinger vs. Whittaker, 82 Ill., 22; 3 Scam., 261; 21 Cal., 104.

That it is the better practice to give notice we do not doubt, and if the motion to vacate the order or writ in this case was one in which the mortgagor admitted that he was in possession of property covered by the mortgage and decree of foreclosure and sale, and had moved promptly to vacate and set aside the order and writ and restore possession,

simply on account of the absence of such notice, we should, for the purpose of establishing the practice requiring notice, reverse the order of the Judge of the Second Circuit and direct that the mortgagor be restored to possession ; (16 Cal., 157 ; 35 N. Y., 477;) but without prejudice, however, to future proceedings by Wright for another writ. Notice to the party in possession is to be preferred, in that it secures to him an opportunity to set up any claim to the possession which may have arisen by arrangement between himself and the purchaser subsequent to the decree and sale, and thus save him both the annoyance of having to move to vacate, and the wrong of being put out of possession on an ex parte hearing, if he has such new claim to possession. 28 N. J. (Eq.), 412 ; 45 Cal., 316.

We do not, however, understand that the appellants refused to give possession of property covered by the mortgage or decree, or claimed to have been deprived of possession of any such property without notice ; they distinctly say that they are and always have been ready to give possession according to the description of the lands in the mortgage and decree, but they say the description of the property for which the writ was given is not the description in the decree, but that it includes a mill and other property not included in the decree, and of this mill and other property the Sheriff has, by virtue of such writ, deprived them of the possession and put Wright in possession.

Both the mortgage and the decree state that the parcel of land containing ten acres, more or less, described by metes and bounds are known as the McLane Mill Tract, and the writ of assistance described it as the McLane Mill Tract, stating that it contained ten acres, more or less ; and in both descriptions all the buildings, improvements, struct-

ures of any kind, saw mill, boilers, machinery fixtures, tools and implements on said premises are mentioned. The writ of assistance refers to the mortgage and decree in the cause, and clearly shows that the same property described in them was meant. Though the description in the writ is not as detailed as that in the mortgage and decree, it is clearly not only a description of the same property, but a description of it which the last mentioned instruments contain. Cook vs. Welles, 42 Mich., 439.

The contention of appellants is, in view of the conclusions we have reached, and as will plainly appear from the statement made of the case, nothing more or less than that the mill and appurtenances are not on the land described in the mortgage and decree.

Dr. McLane has, in his affidavit, stated no facts in support of his assertion that "the mill and other property" are not included in the description given by the mortgage and decree. That it was his intention to mortgage the mill and other improvements referred to in them cannot be doubted. Though in the first part of his answer he says he does not believe either that the description in the mortgage is a correct description of the land intended to be embraced therein, or that the saw mill and fixtures as described therein are located on said land as described, yet in a subsequent paragraph he says that at the time the first contract was entered into " he was the owner of the steam saw mill *described in the mortgage*, situated on Tucker's Bayou, at Point Washington," and again, further, he speaks of it as his " said mill," and again he says that Campbell represented to him that Piaggio Brothers would give him nearly two years to pay if the amount was secured by mortgage on his mill property and that then he executed the notes and mortgage.

In view of these statements, Dr. McLane's assertion at

this late day, that the mill is not on the land described in the mortgage, cannot, in the absence of facts to prove that such is the case, be given much weight.

There is still other evidence of the intent to mortgage the mill in question, and that he regarded it as covered by the mortgage. The affidavits of Campbell and Piaggio show that he furnished the description as covering the mill property, (Parkiss vs. Benson, 28 Mich., 538,) and from that of Piaggios we must believe that McLane has owned no other mill in Washington county, and it is clear that from this and Wright's affidavit that the mill has been known as McLane's mill, and the land upon which it stands as McLane's mill tract.

If McLane is not estopped to deny that the mill property is covered by the mortgage and decree, still the evidence does not prove that such property is not on the land described in them. The plat of Miller's survey is not of itself sufficient for this purpose. There is no evidence that Miller commenced his survey at the same pine tree as was meant by McLane when he gave the description for the draft of the mortgage, or that Miller knew it was the same, or that McLane pointed it out to him as being such, or that there was, at the date of the mortgage, January 6th, 1883, no pine tree "*about*" the initial point stated therein, a survey from which made according to the courses and distances named, would have effected the intention of the parties as to the mill property. In the absence of clear testimony to the contrary, it must be held as against McLane that there was such a tree so located as well as the other trees, and that lines run from one to the other did, with the shore line, include the mill property; and though McLane may have been mistaken as to both the exact length and courses of the lines, it cannot, upon this record,

be held that he was mistaken as to a location of the trees that would include the improvements in question.

That Miller made a survey, and made it honestly, we do not question, but that it is a survey of the identical land described in the mortgage and decree there is no sufficient evidence, and the motion to vacate should have been denied simply on the ground that there was no proof that the mill improvements were not on such land, if for no other reason.

In conclusion, we may remark that a purchaser should, upon demanding possession, exhibit his deed from the master, and the vendee of such purchaser should exhibit both such deed, and his deed from the purchaser, if he intends to apply for a writ of assistance. No objection was made to the allowance of the writ, on these grounds, in this case. Ketchum vs. Robinson, 48 Mich., 610.

The decree and orders appealed from are affirmed.